IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA

V.                          NO. 07-50076

MITCHELL SCOTT JOHNSON

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

On November 8, 2010, the Defendant/Movant Mitchell Scott Johnson (hereinafter "the Defendant") filed a 28 U.S.C. § 2255 motion.  (Doc. 43).  The parties thereafter submitted briefs, and the matter is now ripe for consideration.  The undersigned, being well and sufficiently advised, finds and recommends as follows with respect thereto:

### PROCEDURAL BACKGROUND

1.  On September 26, 2007, a one-count Indictment was returned charging that Defendant, while being an unlawful user of or addicted to marijuana, possessed a firearm which had previously traveled through interstate commerce, all in violation of Title 18 U.S.C. § 922(g)(3) and 924(a)(2).  (Doc. 1).

2.  A jury trial was held on January 28 and 29, 2008, and on January 29, 2008, the jury returned a guilty verdict against Defendant.  (Doc. 22).

3.  On September 5, 2008, a judgment was entered, sentencing the Defendant to forty-eight (48) months

-1-

imprisonment;  a term of three (3) years of supervised release; and a $100 assessment.  (Doc. 34).

4.  On July 31, 2009, the Eighth Circuit Court of Appeals affirmed Defendant's conviction and sentence.  United States v. Johnson, 572 F.3d 449 (8th Cir.), cert. denied, 130 S.Ct. 569 (2009).

### GROUNDS FOR § 2255 MOTION

5.  In the motion now before the Court, which Defendant filed pro se, Defendant asserts the following grounds for relief:

Ground One: That his conviction was obtained by the use of evidence gained pursuant to an unconstitutional search and seizure;

Ground Two: That his conviction was obtained by a violation of the protection against self-incrimination;

Ground Three: That his conviction was obtained by the unconstitutional failure of the Government to disclose to the Defendant evidence favorable to him;

Ground Four: That he was denied effective assistance of counsel when counsel for Defendant:

> *Failed to move to suppress inadmissable statements/video;
>
> *Failed to move to suppress excludable evidence from the record;
>
> *Failed to object at pre-trial discussions how the trial court judge planned on conducting voir dire,

-2-

barring Defendant later at trial to said objections during the actual voir dire;

*Failed to obtain evidence from the Government to privately test evidence;

*Failed to obtain a psychologist to examine Defendant to establish whether Defendant had an Addictive Personality Disorder;

*Failed to establish how long marijuana would stay in Defendant's system, preventing the essential link to all negative drug screens;

*Failed, upon Defendant's request, to move for change of venue, to avoid possible tainted jury pool from media accounts of the instant case;

*Failed to raise proper grounds to efficiently object to the use of Defendant's juvenile ajudications [sic] to be used against Defendant to upwardly depart/variate sentences citing proper Arkansas Statute would have barred prosecution from using juvenile ajudication [sic] as a basis to move for upward departure; also would not have been available to use to count against Defendant as criminal history in pre-sentencing report; and

*Failed to reinstate motion for judgment of acquittal in court and never giving a hearing or ruling on the original motion.

Ground Five: There was "Judicial Prejudice" in that the trial judge prejudiced Defendant by barring his attorney from conducting proper voir dire questions to the potential jury pool/panel, and by upwardly departing from the guideline range at sentencing.  (Doc. 43).

6.  The Government argues that Grounds One, Two, Three and Five are procedurally barred, since they were not raised on direct appeal.  The Government also argues that even if these

-3-

claims are not procedurally barred, they do not warrant relief.

7.  With respect to Ground Four, ineffective assistance of counsel, the Government argues that Defendant's counsel was not deficient and Defendant was not prejudiced under the standard set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

## FACTUAL BACKGROUND

8.  At the trial in this matter, Detective Steven Woodward Hulsey, who was employed by the Washington County Sheriff's Department, testified that on January 1, 2007, the communication center at the Sheriff's Department put a call through to Detective Hulsey's cell phone from a woman who had contacted the Sheriff's Department.  The woman advised Detective Hulsey that she knew of two gentlemen who lived in the Fayetteville area in apartments off of Gregg Street, and that they were purportedly in possession of 100 pounds of marijuana and weapons, and they were in the process of moving to California.  (Trial Tr. at p. 128).  Detective Hulsey, accompanied by Deputy Geneva Tomlinson, thereafter went to the apartments to see if he could locate the vehicle the woman described (a van) at the apartments. When he did not find the van at the apartments, he called the woman back and said the van was not there.  The woman told him that one of the gentlemen was at Wal-Mart on Mall Avenue in Fayetteville.

9.  Detective Hulsey thereafter contacted narcotics officers with the Fourth Judicial Drug Task Force, and they

-4-

located the van at the Wal-Mart parking lot.  Detective Hulsey
spoke to the woman a third time, at which time, she told him
that Defendant was the individual driving the van;  that Justin
Trammell, his roommate, was inside the apartment;  and that
Defendant would be returning to the apartment shortly.

10.   Detective Hulsey and Deputy Tomlinson thereafter set
up surveillance in a park that was located next to the apartment
building.   Approximately 15 to 20 minutes later, Detective
Hulsey observed the van pull into the parking lot and park, and
a person exit the van, and then enter the apartment.
Approximately 15 to 20 minutes later, Detective Hulsey observed
two white males, one of whom later proved to be the Defendant,
loading stuff from the apartment into the van.   The two
individuals then entered the van and left the apartment complex.
Detective Hulsey followed the van and observed it go right of
the roadway over the yellow solid line, and then back left of
center.   At that point, Detective Hulsey initiated a traffic
stop.  (Trial Tr. at p. 131-32).   Detective Hulsey approached
the driver's side of the van and identified himself, explained
the reason for the stop, and identified the driver as Justin
Trammell and the passenger as Defendant.

11.   Prior to making the stop, Detective Hulsey made
contact with Deputy Ti Augustine, the canine handler for the
Sheriff's Office, to advise him that his assistance might be

-5-

needed later.  Detective Hulsey also contacted Bret Hagan, who was the officer in charge for the evening shift, to advise him that his assistance might be needed as well.  (Trial Tr. at p. 134).

12.  While Detective Hulsey was standing at the driver's side door speaking to Mr. Trammell, Deputy Augustine arrived and approached the passenger side of the van.  While Detective Hulsey was obtaining Mr. Trammell's identification, he could smell the odor of marijuana coming from the vehicle, at which time he asked Mr. Trammell for consent to search the vehicle. Mr. Trammell advised him that the van did not belong to him, but to Defendant.  At that point, Detective Hulsey changed positions with Deputy Augustine and began speaking to Defendant.

13.  Detective Hulsey asked Defendant if someone in the vehicle had been smoking marijuana, or specifically if he had, because he could smell the odor coming from the driver's side. Defendant responded that he had not been smoking marijuana, but did not know if the driver had been.  At that point, Detective Hulsey asked Defendant if he had any drugs in the vehicle and if he minded if Detective Hulsey looked to make sure.  Defendant told Detective Hulsey that he did not mind if he took a look in the vehicle, and Detective Hulsey then told Defendant to step back to the front of the detective's vehicle.  Detective Hulsey filled out a written Consent to Search form, read the form to

-6-

Defendant, and had Defendant sign it.

14.    After Defendant signed the consent form, Detective Hulsey asked Defendant if he had any weapons "upon his person" because he was wearing a baggy coat, and Defendant told him he did not.  Detective Hulsey then asked Defendant if he minded if he patted him down for his safety, and Defendant did not object. When Detective Hulsey patted Defendant down, Detective Hulsey felt a bulge in Defendant's left pants pocket, and then asked Defendant what it was.  Defendant responded, "That's what you're looking for.  It's a little bit of weed."[1]  Detective Hulsey then pulled it out, set it on the hood of his vehicle, and then placed Defendant in handcuffs for possession of marijuana. (Trial Tr. at p. 140).

15.    Detective Hulsey placed Defendant in the backseat of the detective's vehicle, then gave the Consent to Search form to Deputy Tomlinson, and told her to go stand at the rear of his vehicle in case the Defendant wanted to withdraw the consent.

16.    Detective Hulsey testified that when he found the marijuana, he asked Defendant if there were any guns in the van, and Defendant told him he had a loaded gun, which he had received for Christmas, in a backpack in the van.

17.    After Detective Hulsey placed Defendant in the back

---

[1]On cross-examination, Detective Hulsey admitted that in his police report, he reported that Defendant said, "That's what you're looking for."  (Trial Tr. at p. 176).

of his vehicle, Deputy Hagan arrived and Deputy Hulsey filled him in on what had transpired.  Deputy Augustine then ran his canine around the van to see if he alerted to the odor of narcotics, and then they began to search the vehicle.  Deputy Hagan located the loaded pistol in the rear of the van under some bags in a backpack.  (Trial Tr. at p. 143).

18.  After the gun was found, Detective Hulsey transported Defendant to the Washington County Sheriff's Office.

**ARE GROUNDS ONE, TWO, THREE AND FIVE PROCEDURALLY DEFAULTED?**

19. A review of Defendant's motion reveals that Defendant failed to raise these claims on appeal.[2]  Therefore, he procedurally defaulted these claims and cannot obtain § 2255 relief unless he can demonstrate cause and prejudice excusing the default,  United States v. Collier, 585 F.3d 1093, 1097 (8th Cir. 2009), or the Government waives the default.

In his motion, in response to the question of why he did not raise these claims on appeal, Defendant asserts that:  as to Grounds One and Two, his counsel filed "a motion as moot his motion to suppress statements, barring this issue to be raised on direct appeal;" and as to Ground Three, Defendant's counsel

---

[2]With respect to Defendant's contention in Ground Five that the trial judge was prejudiced because he imposed an upward variance from the guideline range, Defendant did appeal his sentencing to the Eighth Circuit, which addressed the trial judge's upward variance and affirmed Defendant's sentence.  Therefore, this issue cannot be re-litigated in a motion to vacate pursuant to § 2255.  See Sun Bear v. United States, 644 F.3d 700, 702 (8th Cir. 2011)(with rare exceptions, § 2255 may not be used to relitigate matters decided on direct appeal).

AO72A
(Rev. 8/82)

failed to raise any objection to the trial court, barring this issue from direct appeal.  It is unclear from Defendant's motion why he did not raise Ground Five on direct appeal.  Defendant also asserts that the reasons for not raising these grounds on appeal was "because Defendant was denied Effective Assistance of Counsel, and also have been procedurally barred on direct appeal, until filing this motion."  (Doc. 43 at p. 11).

20.   Habeas relief is an extraordinary remedy which will not be allowed to do service for an appeal, and significant barriers exist in the path of a petitioner who seeks to raise an argument collaterally which he failed to raised on direct review.  See United States v. Moss, 252 F.3d 993, 1001 (8th Cir. 2001)(citing Bousley v. United States, 523 U.S. 614, 621 (1998), cert.denied, 534 U.S. 1097 (2002).  "More specifically, a claim unraised on direct appeal is procedurally defaulted unless a petitioner can demonstrate (1) cause for the default and actual prejudice or (2) actual innocence."  Id.; see also Swedzinski v. United States, 160 F.3d 498, 500 (8th Cir. 1998)(where issue is raised for the first time in a § 2255 motion and petitioner did not raise the issue at trial or on direct appeal, the issue is procedurally defaulted), cert. denied, 528 U.S. 846 (1999). Ineffective assistance of counsel may constitute cause and prejudice to overcome a procedural default.  See Becht v. United States, 403 F.3d 541, 545 (8th Cir. 2005), cert. denied, 546 U.S.

-9-

1177 (2006).

21. To overcome the procedural default of Grounds One, Two, Three and Five, it appears that the Defendant is asserting ineffective assistance of counsel. The Court will, therefore, construe Grounds One, Two, Three and Five as being, in essence, ineffective assistance claims, the basis of which overlaps to large extent with the ineffective assistance claims asserted in Ground Four. The Court will address Grounds One, Two, Three and Five in turn and, to the extent the Defendant has asserted separate ineffective assistance claims in Ground Four, the Court will then address those claims.

### INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD

22. To establish ineffective assistance of counsel, both as an independent claim and as cause and prejudice to excuse a procedural default, Defendant must satisfy the familiar standard established in Strickland, 466 U.S. 668, which requires a showing "that his lawyer's performance fell below the minimum standards of professional competence (deficient performance) and that there is a reasonable probability that the result of the proceedings would have been different if his lawyer had performed competently (prejudice)." King v. United States, 595 F.3d 844, 852 (8th Cir. 2010). If Defendant fails to show deficient performance by his counsel, the Court does not need to proceed any further in its analysis of an "ineffective

-10-

assistance" claim.  <u>United States v. Walker</u>, 324 F.3d 1032, 1040 (8th Cir. 2003), <u>cert. denied</u>, 540 U.S. 898 (2003).  Defendant's burden is a heavy one, <u>DeRoo v. United States</u>, 223 F.3d 919, 925 (8th Cir. 2000), and there is a "strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance."  <u>Davis v. Norris</u>, 423 F.3d 868, 877 (8th Cir. 2005).

The prejudice requirement has been held to require that there be a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  <u>See</u> <u>United States v. Ledezma-Rodriguez</u>, 423 F.3d 830, 836 (8th Cir. 2005).  In addition, every effort should be made to eliminate the "distorting effects of hindsight" in assessing the attorney's conduct.  <u>Strickland</u>, 466 U.S. at 689.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so *undermined* the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  <u>Id.</u> at 699.

### GROUNDS ONE AND TWO

23.   Grounds One and Two will be treated together, as Defendant is arguing that because he was never read his <u>Miranda</u> rights, "all statements made by defendant and used against him were unconstitutionally seized, and unlawfully played to the jury for their review," and that he was deprived of the

-11-

privilege of protection against self-incrimination, allowing "unlawful evidence to be presented to jury." (Doc. 43 at pgs. 5 and 6).

24. On January 14, 2008, Defendant's counsel filed a Motion to Suppress, seeking to suppress incriminating statements made by the Defendant after he was taken into custody, but before he was read his <u>Miranda</u> rights. (Doc. 17).

25. Defense counsel subsequently withdrew the motion as moot, as he entered into a stipulation with the Government that certain statements made by the Defendant were in violation of <u>Miranda</u> and would not be admissible. (Doc. 18). Accordingly, at trial, the jury only heard evidence of the following potentially incriminating statements made by the Defendant:

- When Detective Hulsey patted the Defendant down and asked what the bulge in his pocket was, the Defendant said, "That's what you're looking for. It's a little bit of weed." (Trial Tr. at p.140)

- Defendant told Deputy Tomlinson, when she was obtaining his consent to search the vehicle, that there should be nothing illegal in his car, but that "I had a little bit of marijuana in my pocket a second ago, and - but - but there should not be any more in that vehicle. Okay?" (Trial Tr. at p.164)

- While Detective Hulsey was standing at the front of the patrol vehicle looking at the marijuana found on Defendant, Defendant was seated in the rear of the vehicle, and, without any solicitation by Deputy Tomlinson, said "I've had that for awhile. It's personal use." (Trial Tr. at p.165)

- After Deputy Tomlinson read the consent form to Defendant again, he told her that "he got a pistol for Christmas that was in a backpack, and that the – the

-12-

substance that was in his pocket was all he had, and that it was for personal use, and he's had it awhile." (Trial Tr. at p.206).

The above statements are incriminating only to the extent that they implicate the Defendant in the possession of marijuana for personal use. As the Eighth Circuit observed, the Government provided sufficient evidence, aside from the Defendant's statements, that the Defendant was an unlawful user of marijuana:

> [T]he Government presented testimony that Johnson had 19.3 grams of marijuana on his person on the night of his arrest and that he admitted that this marijuana was for "personal use." Even if Johnson had not admitted that the marijuana was for personal use, the small amount of marijuana in his possession supports the inference that he was a user of marijuana....Moreover, the Government elicited testimony from several of Johnson's former coworkers who had witnessed his regular use of marijuana....
> "[T]he government does not need to prove that the defendant was actually using ... drugs at the exact moment that he purchased the firearms in question in order to be convicted as an 'unlawful user.'" (citation omitted). The Government need only prove that Johnson was an unlawful user of marijuana at the time he possessed the firearm. (citations omitted). The Government presented evidence that Johnson had smoked marijuana regularly between October or November 2006 and January 2007, that he had a user amount of marijuana on his person at the time of his arrest, ..., and that he possessed a Lorcin 9 millimeter firearm in his van at the time of his arrest. Thus, the jury could have reasonably concluded that Johnson was an unlawful user of marijuana in possession of a firearm.

Johnson, 572 F.3d at 453. Thus, the Defendant has failed to demonstrate that his counsel was deficient in any way in allowing the above statements into evidence or that he was prejudiced by the admission of these statements.

-13-

## GROUND THREE

26.  Defendant contends that the Government failed to fully disclose, in a timely manner, that the Arkansas State Crime Lab's primary test results of the substance found on Defendant were negative for any controlled substances;  that his counsel was not notified until three days prior to trial of the results; and that he was unable to have the substance tested privately. In alleging ineffective assistance of counsel, Defendant contends that his counsel "failed to obtain evidence from prosecution to privately test evidence."

27.   At the trial, Defendant's counsel presented the testimony of Ms. Claire M. Carle Putt, chemist with the Arkansas State Crime Lab, who initially tested a representative sample from the substance found in Defendant's pocket.   The initial test, dated October 29, 2007, reported "Marijuana, 20.2 grams." (Trial Tr. at p. 304).   However, Ms. Putt testified that the report was in error, and that the actual findings were negative for marijuana.  Ms. Putt did not realize the error until three days prior to trial, when she was preparing to testify at the trial.  When she discovered the error, she created an amended report on January 24, 2008, so that the report read "No controlled substances detected."  Ms. Putt testified that she stood by her original negative test.  (Trial Tr. at p. 312). Ms. Putt testified that after she sent out the amended report, her

-14-

supervisor, Gary Dallas, Chief Forensic Chemist for the Arkansas State Crime Lab, took the three samples and retested them on January 24, 2008, which resulted in a positive test for marijuana.  (Trial Tr. at pgs. 313-14).

28.  During Mr. Dallas' direct examination, he was asked what could have accounted for the discrepancy in the test performed by Ms. Putt and the test performed by him.  He testified that in some cases where the tetrahydracannabinol (THC) content might not be as strong as in other cases, "if it was a weak result, the analyst chemist could follow with a retest of the same sample at their – at that time, reconcentrate the solvent extraction, or any number of methods to really retest the same sample.  In this case, she relied on the same result that she had on the first trial, and possibly not have concentrated enough to show a positive test."  (Trial Tr. at p. 224).   Mr. Dallas indicated they were still in the process of reviewing where the breakdown occurred.  (Trial Tr. at p. 226).

29.  Defendant's counsel extensively cross-examined Mr. Dallas, who said he had no doubts about the results of his test.

30.  It is possible that Defendant's counsel did not request an opportunity to obtain an independent analysis of the substance because such an analysis might have resulted in a positive test for marijuana, which would have been prejudicial to Defendant.  As it turned out, Defendant's counsel was able to

-15-

extensively cross-examine Ms. Putt and Mr. Dallas, with the hope of creating a question in the jury's mind as to the real identity of the substance.   In fact, Defendant's counsel referenced this confusion in his closing statement.  (Trial Tr. at p. 385).

31.   Counsel's trial strategy is entitled to great deference, and the Defendant must "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Flowers v. Norris, 585 F.3d 413, 417 (8th Cir. 2009), cert. denied, 130 S.Ct. 3494 (2010), quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955). In this case, the Defendant has failed to prove that his counsel was deficient in failing to obtain an independent examination of the substance.

## GROUND FIVE

32.   Defendant contends that the trial judge prejudiced Defendant by barring his attorney from conducting proper voir dire questions to the potential jury pool/panel.

33.   A review of the trial transcript reveals that at the beginning of the trial, Judge Hendren read the indictment to the potential jurors and then asked of them:

> Do any of you know, or think you know, anything at all about the Defendant, Mitchell Scott Johnson, or the incident of January 1, 2007, which is the subject of the Indictment I just read?  Now, ladies and gentlemen, as to this question, I'm not asking if you have heard, seen, or read media reports.  That'll be another question in a

-16-

> moment.  My question is this: Do any of you know, or think
> you know, anything at all about the Defendant, Mitchell
> Scott Johnson, or the incident of January 1, 2007, which is
> the subject of the Indictment I just read to you?  Now, let
> me finish, finish my question.  If, other than by reason of
> something you may have heard, seen, or read in the media,
> you think you may know something about either the Defendant
> or the Indictment, please raise your hand. ...

(Trial Tr. at p. 7).  Various potential jurors responded, and

the Court inquired further of those individuals, and asked them

if it would be difficult or impossible for them to be a fair

juror in the case, to which they responded negatively.  The

transcript further reveals that both counsel for the Government

and Defendant conducted their own voir dire.  (Trial Tr. at p.

59-67).  During the voir dire process, while Judge Hendren was

asking individual jurors questions, counsel for the Government

told Judge Hendren that some of the people who had indicated

that they heard about the case had not been questioned further

by the judge.  She stated that they expressed during voir dire

that it was not a problem for them, but she wanted to know if

the Court planned or intended to inquire further.  Judge Hendren

responded:

> THE COURT: No.  Remember what I said. Those folks advised
> that despite what you've heard so far, can you still be
> fair, and they said yes, and I didn't intend to inquire
> further. Now, if you –
>
> MS. TAYLOR: No, I'm fine.
>
> THE COURT: If you think there's something else, then I'll
> certainly listen.
>
> MS. TAYLOR: No, sir.  I just wanted to make sure.

-17-

THE COURT: Defense?

MR. SCHISLER: Your Honor, on that issue, I think – I have a concern that the people that were familiar with the case through the media or whatever means, and then were asked whether they could be fair and impartial, and they answered yes, might need to be, if not individually talked to like these other people that wanted to come up, at least addressed as a group, because of what Ms. Patton said, she was one of the people that would not have gotten a second look based on what she said in response to the Court's questions. And then later, she comes up and reveals this information. I don't know how many other people out there are in the same situation who have, for whatever reason, not decided to come up. I mean , the Court was (unintelligible) in its lack of further inquiry based on "Can you be fair and impartial?" "Yes, but" – That has proven, through Ms. Patton, not to work.

THE COURT: I don't agree. I think what I've done – and I talked to the – because I said in pretrial what I was going to do. I think neither of you objected to that at the time, and when I gave the folks an opportunity to come forward and talk, she did. I don't know what you suggest now. Should I retreat from that protocol simply because one of them came forward to talk or do it then like they were invited to do? I just don't think that changes anything at all because I can see us going on and on. We don't want to go back and say, "I know you folks have said it wouldn't bother you, but I want to ask you more about it." I don't see any reason to do that since they didn't come forward. I'll decline to do that. Your position is, you think I should?

MR. SCHISLER: Yes. Yes, Your Honor, that's right.

THE COURT: All right. I'll decline to do that. ...

(Trial Tr. at p. 06-98).

34. It is clear that Defendant's counsel was allowed to conduct his own voir dire of the potential jurors. In addition, it is clear that Judge Hendren sufficiently inquired of the potential jurors whether any information they might have

-18-

regarding the case would make it difficult or impossible for them to be fair and impartial, to which they responded in the negative.

35.  The form and scope of voir dire rests primarily in the discretion of the court.  United States v. Granados, 117 F.3d 1089, 1092 (8th Cir. 1997).  Defendant has failed to show any judicial bias in the voir dire proceedings, and his counsel was afforded every opportunity to carefully examine the potential jurors.  Counsel's performance was not deficient in this regard. Further, Defendant has failed to show how he might have been prejudiced.

**GROUND FOUR - REMAINING INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS**

36.  Defendant contends that his counsel was ineffective for failing to obtain a psychologist to examine Defendant, to establish whether Defendant had an Addictive Personality Disorder, or how long marijuana would stay in Defendant's system, "preventing the asserted link to all negative drug screens." (Doc. 43 at p. 9).

The Court believes that once again, it may very well have been trial strategy on the part of Defendant's counsel not to obtain a psychological report to determine whether Defendant had an addictive personality.  Such an exam could have also resulted in a result that was prejudicial to Defendant.

With respect to the length of time marijuana could stay in

-19-

AO72A
(Rev. 8/82)

one's system, contrary to Defendant's assertion, Defendant's counsel directed questions to Mike Scott, a probation officer with the United States Probation Office, who was assigned to supervise Defendant.  Mr. Scott administered three drug tests to Defendant while he was on pretrial release.  (Trial Tr. at pgs. 325-26).  Mr. Scott testified that the tests were generally administered 30-45 days apart.  (Trial Tr. at p. 346).  He states: "In this particular case, the drug charged is marijuana, and usually between 30 to 45 days, marijuana would stay in one's system."  (Trial Tr. at p. 347).  It is clear that Defendant's counsel attempted to introduce Mr. Scott's testimony that marijuana usually lasted in one's system for 30-45 days, but was unsuccessful, as the Court sustained the Government's objection regarding this statement.  Therefore, Defendant's counsel was not deficient in this regard.

37.  Defendant contends that his counsel was ineffective by failing to request a change of venue, "to avoid possible tainted jury pool from media accounts of instant case."  (Doc. 43 at p. 9).  However, Defendant has failed to indicate what media accounts existed, or what prejudice he might have suffered as a result of "media accounts."  In United States v. Allee, 299 F.3d 996 (8th Cir. 2002), the Court stated that the mere existence of press coverage is "not sufficient to create a presumption of inherent prejudice and thus warrant a change of venue.  To

-20-

create a presumption, the coverage must be inflammatory or accusatory." Id. at 1000; see also Mathison, 2011 WL 2635863, at *11 (N.D. Iowa July 5, 2011).

38.   Defendant has not met his burden of showing that his counsel was deficient in not seeking a change of venue, or that he was prejudiced by the failure to do so.

39.   Defendant next contends that his counsel was ineffective for failing to renew his Motion to Dismiss the Indictment and Acquittal at the conclusion of the trial.

"An indictment is sufficient if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution." United States v. Huggans, 650 F.3d 1210, 1217 (8th Cir. 2011) quoting United States v. Summers, 137 F.3d 597, 601 (8th Cir. 1998)(internal quotation marks omitted).  "An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted."  Huggans, 650 F.3d at 1217, quoting United States v. Hayes, 574 F.3d 460, 472 (8th Cir. 2009)(internal quotation marks omitted).

In the present case, at the end of the presentation of the Government's case, Defendant's counsel moved to dismiss the

-21-

indictment.    (Trial Tr. at p. 301).   Judge Hendren indicated
that he would take the motion under advisement and would rule on
it at a later time.

"In order for the trial court to grant a motion for
acquittal, there must be no substantial evidence from which the
jury could find for the nonmoving party, and there must be no
way that reasonable minds could reach any other conclusion."
Jackson v. Lockhart, 992 F.2d 167, 169-170 (8th Cir.
1993)(involving defense counsel's failure to renew motion for
acquittal at conclusion of evidence presented in state court).

After reviewing the transcript of the trial in this case,
the Court is of the opinion that if Defendant's counsel had
renewed his motion for acquittal at the conclusion of all of the
evidence, it is highly unlikely that the trial judge would have
granted it.   The indictment was clear regarding the crime
charged, there was uncontradicted evidence that Defendant
possessed a gun, and there was overwhelming evidence that
Defendant was at least a "user" of marijuana.   Therefore,
Defendant's counsel was not deficient in failing to renew his
motion to dismiss the indictment or move for an acquittal at the
conclusion of the case.

Furthermore, as there was sufficient evidence presented so
that reasonable minds could disagree, it is highly unlikely that
the trial judge would have granted a renewed motion to dismiss

-22-

or motion for acquittal. Defendant was therefore not prejudiced.

**CONCLUSION**

40. Based on the foregoing, the undersigned hereby finds and recommends that Defendant should be DENIED relief on all of his § 2255 claims and that his § 2255 motion (Doc. 43) be DISMISSED WITH PREJUDICE.

**The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

IT IS SO ORDERED this 8th day of December, 2011.

/s/ *Erin L. Setser*
_____
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)